# EXHIBIT D

Jose Herrero  CORRECTED
April 14, 2023

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 1:22-CV-24085-RKA

JOSE HERRERO,

        Plaintiff,

vs.

SOUTH MIAMI HOSPITAL, INC.,
D/B/A, A/K/A, SOUTH MIAMI
HEALTH SOUTH FLORIDA, A
FLORIDA CORPORATION,

        Defendant.

_____/

CORRECTED TRANSCRIPT

DEPOSITION OF:          JOSE HERRERO

DATE TAKEN:             APRIL 14, 2023

TIME:                   10:21 A.M. - 2:50 P.M.

PLACE:                  LITTLER MENDELSON, P.C.
                        333 SOUTHEAST 2RD AVENUE
                        SUITE 2700
                        MIAMI, FLORIDA 33131

TAKEN BEFORE:           WENDOLYN ISON, COURT REPORTER
                        and NOTARY PUBLIC

Jose Herrero  CORRECTED
April 14, 2023

1      A.    Health physician.

2      Q.    Is it called house surgical --

3      A.    Surgical.

4      Q.    Surgical health physician?

5      A.    Surgical assistant.

6      Q.    So for purposes of todays proceedings, when

7    we're talking about surgical house physician or surgical

8    assistant, we can agree that we're both referring to the

9    same thing?

10      A.    Same thing.

11      Q.    Now my understanding is that surgical assistant

12    position requires that you work under the supervision of a

13    licensed doctor, is that correct?

14      A.    Yes.

15      Q.    So you're not able to participate in procedures

16    without doctor supervision?

17      A.    I'm not able to participate without a

18    physician.

19      Q.    Was there a director of surgery as of June 1st,

20    2021?

21      A.    Can you repeat the question.

22      Q.    Yes.  Was there a person who was the director of

23    surgery of the surgical department on June 1, 2021?

24      A.    Yes.  Norma Sabates.

25      Q.    S-A-B-A-T-E-S.  And is she the person that you

Jose Herrero  CORRECTED
April 14, 2023

1   reported to?

2        A.    Yes.

3        Q.    And how long did you report to Ms. Sabates for?

4        A.    What's the question?  How long?  Can you

5   repeat.

6        Q.    Yes.  How long did you report to her?

7        A.    Until June 1st was my last day.

8        Q.    Yes.  How long though?  From how long before

9   that, two years, three years, two months?

10       A.    She wasn't the whole time the director of

11  surgery.  Maybe three years, four years before 2021 she

12  entered in South Miami.  I can't recall exactly.

13       Q.    Okay.  But you reported to her for three or

14  four years as the director of she -- with her being in the

15  role of director of surgery?

16       A.    Yes.

17       Q.    And how was your relationship with Ms. Sabates?

18       A.    I think it was fine.  As an employee you don't

19  have too much contact with directors.

20       Q.    Okay.  You never submitted a workplace complaint

21  against her, right?

22       A.    I never submit a what?

23       Q.    A workplace complaint against her?

24       A.    As far as I know, I guess that submitted no

25  formal complaint but just a concern as to her and human

Jose Herrero   CORRECTED
April 14, 2023

1   surgery like holding, cauterizing, ligation, closing

2   wound, skin layer and position the patient, prepping if

3   it's necessary, doing physical examination and helping

4   in any other need within the department per instruction

5   of the supervisor.  Mostly helping in surgery and within

6   the OR we helping the people, the patients from the

7   pre-op to the OR, position, protecting and helping the

8   surgery in front of the surgeon.  Just providing

9   hemostats and whatever is necessary, disposal during the

10  surgery according to the case.

11          (Defendant's Exhibit No. 8, Document, was

12  marked for identification.)

13  BY MS. GARCIA:

14      Q.   So you made a reference to the job description.

15  Let me actually show you that.  Let me show you what I'm

16  going to mark for identification purposes as Exhibit 8 and

17  again, for the record all these are under the cover of

18  confidentiality for now.  Do you recognize that document?

19      A.   Yes.

20      Q.   Okay.  This is the job description applicable to

21  the surgical health physician position that you held as of

22  June 2021?

23      A.   I am not sure it's exactly the same.  All the

24  first part is okay, but maybe some of the last page.  I

25  can't recall exactly.  It was in the one that I had and

Jose Herrero  CORRECTED
April 14, 2023

1   description that I remember, but some specific date, not

2   even verbally, they mention when we start working in

3   that like the one that I mentioned like holding

4   something, but in general we move patients from the OR

5   table to the stretcher.  Not exactly that particular

6   detail that what I mentioned, but the rest, I believe

7   it's okay.

8        Q.   Okay.  Now my understanding is that South Miami

9   Hospital is a multidisciplinary facility.  Is that your

10  understanding as well?

11       A.   Yes.

12       Q.   And does that mean, that there's not

13  basically -- that multiple types of procedures and

14  multiple types of surgeries are performed at that

15  particular hospital?

16       A.   Yes.

17       Q.   And so surgical assistants such as yourself and

18  your peers there at South Miami Hospital, you are assigned

19  to cover surgeries based on the needs of the hospital and

20  of the patients on any given day?

21       A.   Yes.

22       Q.   And what types of surgeries did you work on in

23  your career as a house physician?  I'm sorry as a house

24  surgical assistant at South Miami Hospital?

25       A.   Multiple.  I can say general surgery, but

Jose Herrero  CORRECTED
April 14, 2023

1   every surgery.  Obstetrics, gynecology, UAO, which is

2   gynecology oncology, arthroscopic surgery which is

3   related to (inaudible) special, colorectal surgery,

4   orthopedic surgery, hand surgery, craniofacial,

5   maxillofacial, plastic surgery.

6        Q.   So fair to say that a whole variety of

7   surgeries?

8        A.   Yes.  Podiatry, vascular surgery.

9        Q.   And emergency surgeries?

10        A.   Yes.

11        Q.   Okay.  So if there's an emergency and somebody

12   comes into the hospital that require emergency surgery, a

13   surgical house physician that's somebody will be assigned

14   to help with that particular surgery?

15        A.   Yes.  Depend on the hour of the day, but even

16   after hours somebody on call have to take it and be

17   ready within 30 minutes at the hospital.

18        Q.   And in your experience, an emergency surgery can

19   be anything from a C-section, emergency C-section to I

20   don't know, somebody being involved in a terrible car

21   accident and showing up to the hospital with 30 broken

22   bones and other issues?

23        A.   Yes.

24        Q.   And now when you are inside the OR assisting

25   with any type of surgery, the medical staff that is inside

Jose Herrero  CORRECTED
April 14, 2023

1    the OR, they need to be able to communicate with each

2    other?

3         A.    As needed, yes.

4         Q.    And fair to say that the surgeon is the person

5    in charge of the surgery that's being performed?

6         A.    Yes.

7         Q.    And the surgeon is the one providing

8    instructions to you and to others regarding what needs to

9    be done?

10        A.    Yes.

11        Q.    And I think you mentioned just a minute ago some

12   people or some days you might be on call and if there is

13   an emergency surgery you might need to go to the hospital?

14        A.    Yes.

15        Q.    That applied to you as well?

16        A.    Yes.

17        Q.    Okay.  And when you are on call you are on call

18   for any type of surgery that might be needed?

19        A.    Yes.

20        Q.    And that is precisely to account for those types

21   of unexpected emergencies that might come up?

22        A.    Yes.

23        Q.    And is there a rotation of who is on call on any

24   given day?

25        A.    Can you repeat it.

Jose Herrero  CORRECTED
April 14, 2023

1    Q.   Sure.  Is there a rotation for who is on call on

2  any given day?

3    A.   Yes.  There is a schedule of the day they

4  assign me on a weekly basis and on call schedule as

5  well.

6    Q.   Okay.  All right.

7    A.   And according to the member of the team the

8  department supervisor make the schedule.

9    Q.   Okay.  So in any given week there will be a

10  schedule that might say Mr. Jose Herrero is working

11  Monday, Tuesday, Thursday and Friday and you're on call

12  Wednesday.  It might say something like that.  Is that's

13  what you're referring to or are you on call multiple times

14  per week?

15    A.   Sometimes according to the department needs

16  when some people are sick they can assign you more than

17  one time a week.  It all depends.  They have variations.

18  Nothing is strictly, but I'm -- most of the time we have

19  an on-call within the week plus the weekend and you can

20  consider they rotating.  But that never happened for

21  real.  It usually -- it should be that way and it was

22  done more or less in that way the way it should be, but

23  not exactly, because another factor like --

24    Q.   So let me ask you so because and again, some of

25  these questions might be obvious to you because this is

Jose Herrero  CORRECTED
April 14, 2023

1    doesn't lower the capacity, the hearing capacity that I

2    had already affected.  It's something subjective to me.

3    I feel the ringing the noise.  But the capacity remain

4    the same that you hear before.

5        Q.    Okay.  So the 70 percent loss on the left does

6    not become worse on a day that tinnitus is more

7    accentuated?

8        A.    According to the specialist, they repeated the

9    test one year, six months and I remain around the same.

10       Q.    Okay.  What is the prognosis?  Is there an

11   expectation that eventually you will not hear anything or

12   that it will remain the same?  Have you been given a

13   prognosis?

14       A.    The prognosis to keep seeing the specialist

15   and I have to carry a hearing aid appointment already

16   for that evaluation with another that specific prognosis

17   for a long time you have to have.

18       Q.    Okay.  You don't currently have hearing aids?

19       A.    Not right now.

20       Q.    Well, you're not wearing them right now.  Do you

21   own hearing aids or no?

22       A.    No.

23       Q.    And you said you have an appointment for that?

24       A.    Yes.

25       Q.    When is the appointment?

Jose Herrero  CORRECTED
April 14, 2023

1      Q.   That was your first time ever going to a hearing

2   specialist?

3      A.   Yes.

4      Q.   Okay.  And who did you visit?

5      A.   Dr. Arrieta.

6      Q.   What's the first name, do you know?

7      A.   Agustin.  It's one of the specialists within

8   the Baptist system and they came out with same

9   diagnosis, bilateral sensorineural hearing loss and

10   tinnitus.

11      Q.   And what prompted you to visit Dr. Arrieta?

12      A.   What, can you repeat?

13      Q.   Sure.  What prompted you to visit Dr. Arrieta?

14      A.   Well, as I say, I was months ago, times ago

15   before February 17 feeling not well when I came out from

16   the OR when I arrived home.

17      Q.   You had what?

18      A.   When I arrived to my house from work, I feel

19   like that noise, like it's something not quite right

20   with me.  Also on a daily my wife was telling me you're

21   not okay.  You have to see the doctor.  You don't hear

22   well, because she start telling me and talking to me in

23   a loud way, a loud manner.  And as a medical person, as

24   a people that have medical knowledge, we sometimes don't

25   give the example and take it like quick.  So I say okay

Jose Herrero  CORRECTED
April 14, 2023

```
 1   I'm going to go to the specialist to (inaudible) and

 2   that was in February 17th, the first time.

 3        Q.   Okay.  And so your wife felt that you needed to

 4   see a specialist because you were not hearing well words,

 5   you go see Dr. Arrieta, Agustin Arrieta, right,

 6   February 17th.  Did he at that point do any hearing tests?

 7        A.   He did.  Yes, he did.

 8        Q.   Okay.  And --

 9        A.   That's why he put in the summary that

10   diagnosis.

11        Q.   Okay.  So his diagnosis you mentioned was the

12   same one that we have already discussed?

13        A.   The same one with the other specialist.

14        Q.   Did he also reach conclusions as to percentage

15   of hearing loss?

16        A.   Yes.  He was the first put in that percent.

17        Q.   Okay.

18        A.   In his evaluation.

19        Q.   So Dr. Arrieta concluded that you had 70 percent

20   loss to the left and 30 percent loss to the right?

21        A.   Yes.

22        Q.   And he's also the one that concluded that you

23   had tinnitus?

24        A.   Yes.  Both detail and the clinical diagnosis

25   from him was bilateral sensorineural hearing loss and
```

Jose Herrero  CORRECTED
April 14, 2023

1      A.   Yes.  I have to be evaluated I believe in five

2  more months.

3      Q.   You have to be what?  I'm sorry.

4      A.   Another appointment in five more months.  I

5  think six months, because I saw her in February, the end

6  of February or March of this year.

7      Q.   Understood.  Are you still under the care of Dr.

8  Arrieta?

9      A.   No.

10      Q.   Other than Dr. Dinh, are you seeing anyone else

11  in connection with your hearing condition?

12      A.    No.  The audiology and the neurotology are in

13  the same office, so one evaluate the auditory test and

14  everything needed, like the new going to be in the next

15  appointment for the hearing aid particular detail but

16  nobody different.  I saw one doctor in UM also.  I had

17  the other appointment in October this year in reference

18  to a CAT scan that was for the same.  It was Dr. Corinne

19  Levine because Dr. Dinh, when she saw the MRI that

20  Arrieta order me, he give me the results over the phone

21  and he said it's okay, but you need something else.  You

22  can get another consultation, evaluation.

23          That's what I did.  Because within the system,

24  it wasn't able to get an appointment and we always look

25  at what we impress going to be best for us and I find at

Jose Herrero  CORRECTED
April 14, 2023

1  in my person, and I have to do whatever necessary to

2  relieve that impact, go for help.  Wearing the hearing

3  aid going to be available and pick the one and impact in

4  the way to I had a problem caused by some factor and I

5  had to live according to the recommendation of the

6  professional.  And understand better as to that.  The

7  way that I have to deal with my human, with my body,

8  with my health status as to that.

9       Q.   Has the loss of hearing or the tinnitus or both

10  impacted your level of concentration?

11       A.   Yes.  Somehow my level of concentration,

12  focus.

13       Q.   How so?

14       A.   And sometimes even speechless sometimes.

15       Q.   Okay.  So --

16       A.   The level.

17       Q.   So how has it impacted your concentration?

18       A.   You're asking about on a scale for the answer.

19       Q.   Or you know, I'm just giving you an example so

20  that you understand.  What I mean, like you know when I

21  the phone impacts my concentration, right, so I'm writing

22  something, then I get distracted by my phone and then I

23  cannot refocus.  So I'm asking you to describe to me how

24  the tinnitus and the hearing loss impacts you in what way

25  do you feel that you can't concentrate as well as before?

Jose Herrero  CORRECTED
April 14, 2023

1      A.   Well, as a result when I get the diagnosis of

2 the evaluation and join it with the tinnitus, it impact

3 me in a way that I'm not the same anymore.  I had those

4 problems and it impact like I cannot concentrate in the

5 same way like before because of that problem.

6      Q.   So are you less focused?

7      A.   I can say less focused, less concentrate.

8 That maybe improve when I start wearing the hearing aid.

9 I don't know.  That's subject to the specialist and the

10 time evolution of course.

11      Q.   Has it impacted your memory?

12      A.   No.

13      Q.   And I think you mentioned and I'm sorry if I

14 misunderstood something about speechless.  Did I hear

15 that?

16      A.   Yes.

17      Q.   Okay.  So explain to me that.

18      A.   It's related to this problem according to the

19 specialist and I mean speechless because you cannot hear

20 very well.  It produce this effect on me or any patient

21 that maybe had the same problem.  I can talk about me.

22      Q.   So in your particular case because you cannot

23 hear very well, then it also interferes with your ability

24 to communicate or to find the words that you want to

25 communicate.  Is that what you're saying?  I'm just trying

Jose Herrero  CORRECTED
April 14, 2023

1   to understand.

2        A.   Repeat the question.

3        Q.   Okay.  So because you cannot hear very well, I

4   think that's what I heard you say, because you cannot hear

5   very well, in your case, that causes you to be speechless

6   or not find the words that you want to communicate, is

7   that what you're saying?

8        A.   Yes.

9        Q.   Okay.  Got it.  All right.  So you go on FMLA

10  March 8th all the way until the end of May and you come

11  back to work, is it June 1st, your first day back?

12       A.   Yes.

13       Q.   Okay.  And do you at that point come back to

14  work with any restrictions?

15       A.   I came back to work with a letter from my

16  specialist from UM, Dr. Dinh.

17       Q.   Okay.  Let me show you what we're going to mark

18  as 9?

19            (Defendant's Exhibit No. 9, Document, was

20  marked for identification.)

21  BY MS. GARCIA:

22       Q.   So do you recognize this document?

23       A.   Yes.

24       Q.   Okay.  This is a letter from Dr. Dinh that you

25  were referring to?

Jose Herrero  CORRECTED
April 14, 2023

1   don't have -- I have certain percent less in one and

2   certain percent in the other ear.

3        Q.   But, for example, now when you and I are

4   talking, sometimes I think you mentioned at the beginning

5   that you need me to repeat or speak louder to make sure

6   that you understand, that you hear what I'm saying,

7   correct?

8        A.   Yes.

9        Q.   Now the letter goes on to state that it is her

10  medical opinion that you use -- in the ear you see number

11  one it says provide in the ear and over the ear hearing

12  protection for surgeries that require loud equipment such

13  as drills and saws and/or transfer to a different surgical

14  department, such as OBGYN, C-sections where loud noise

15  exposure is at a reasonable minimum.  Do you see that?

16       A.   Yes.

17       Q.   Now, the part that says that the number one, the

18  first option to use in the ear and over the ear

19  protection, is it your understanding that this

20  recommendation was so that you would be able to so that

21  you wouldn't hear the noise so that you wouldn't be able

22  to hear the noise in the OR?  Is that the purpose of

23  putting in the ear?

24       A.   Just to protect the hearing sense.

25       Q.   Correct.  So yes, but when you're putting in the

Jose Herrero  CORRECTED
April 14, 2023

1  ear and over the ear protection, that's so that you do not

2  hear the noise in the ear.  You do not hear what's

3  happening?

4       A.  At least to tune out the noise, but they never

5  provided.

6       Q.  I understand.  And then the other option, it

7  says transfer to a different surgical department such as

8  OBGYN, C-sections.  Did you suggest to Dr. Dinh that as a

9  type of surgery that you felt you could do?

10      A.  I comment to Dr. Dinh in my former hospital

11  South Miami there is multiple specialty.  And she

12  mentioned that one of the options is she put in the

13  letter in order to avoid more damage.

14      Q.  But did you ask her --

15      A.  The diagnosis.

16      Q.  Sorry, I didn't mean to cut you off.  Did you

17  suggest OBGYN or did she come up with that suggestion on

18  her own?

19      A.  No.  She asked what other part within the

20  department I can keep working in the department or can I

21  be accommodated and I mentioned, well, there is OBGYN,

22  C-section doesn't have to do with the noise with the

23  same drills and whatever in the OR.  And also there is

24  history and physical examination doing H and P, the

25  clinical history and she wrote the letter in that way.

Jose Herrero  CORRECTED
April 14, 2023

1    wrong.  I have the impairment, but I'm not deaf.  I can

2    do my work and I can be accommodated to other place in

3    my department doing another duty that is not related to

4    that instrument.

5         Q.   Not related to what?

6         A.   To the instrument.

7         Q.   Instrument.  Okay.

8         A.   To the tool using to cutting bone and like

9    areas like OB or doing H&P to avoid worsening my hearing

10   problem.  And I said, oh, no, they cannot accommodate

11   and then when they cannot accommodate you came to me and

12   I had to find out any other alternative position

13   whatever.  Oh, well, I don't feel okay.  I have to

14   analyze this and send me the restrictions, what you're

15   going to offer me and that never happened, not even they

16   asked -- Larry Russian told me about, well, don't speak

17   more to Diana Montenegro.  I'm going to send you the

18   light duty form and that never happened also.  So when I

19   answered in writing by e-mail to Diana even send me the

20   description the job description of any position by the

21   way demeaning position, like cleaning, dietary,

22   transportation.  I said, well, it's really hard for me

23   understand that I cannot be accommodated and you're

24   offering me that position.  So send me the description

25   of that to see, to analyze what it all about, what is

Jose Herrero  CORRECTED
April 14, 2023

1  that position and she never sent it to me.

2      Q.   Okay.  So quick question, well, we have multiple

3  things to talk about in there, but when Diane Montenegro

4  called you June 4th, you were home when she called you?

5      A.   Yes.

6      Q.   Were you alone when she called you?

7      A.   Yes.

8      Q.   Okay.  So there are no witnesses to the

9  conversation?

10      A.   I can't remember exactly, but I think my wife

11  was around.

12      Q.   So you were not alone then?

13      A.   No.

14      Q.   Now you mentioned that Diana told you that Paul

15  Mungo, what's the last name?

16      A.   Paul Mungo.

17      Q.   Mungo and Norma Sabates.  Okay.  So Diana

18  Montenegro told you they concluded that you couldn't be

19  accommodated?

20      A.   Yes.

21      Q.   Okay.  So is it your understanding that Norma

22  and Paul are the ones who made the decision to not

23  accommodate you?

24      A.   That's what she said.

25      Q.   Well, is that your understanding?

Jose Herrero  CORRECTED
April 14, 2023

1   saying that Diana Montenegro discriminated against you

2   because she relayed to you the message from Paul and Norma

3   that you couldn't be accommodated?

4       A.   Yes.  And also because she is the HR director,

5   she notify whatever way the situation in a different

6   way.

7       Q.   Okay.  Other than because she was the HR

8   director and because she communicated to you what Paul and

9   Norma had concluded, is there any other action by Diana

10  Montenegro that you claim constituted discrimination based

11  on disability?

12      A.   Yes.  Also I think the way that she speak and

13  address the conversation to me was really inappropriate,

14  incorrect, like even violating terms that she shouldn't

15  be able to handle it.  Even by the policy she couldn't

16  tell me that you're deaf.  She is not a medical person

17  to manage that and even at that moment she doesn't know

18  anything about my record and everything.  Even knowing

19  that she told me, instead of handling in different way

20  because I'm not deaf and you're the only person that

21  told me you're deaf.  In a nasty way the conversation

22  like when you're telling in the tone criticizing, you

23  know, that's why I mentioned Diana that raise that.

24      Q.   So you claim that Diana Montenegro discriminated

25  against you based on disability because she was an HR

Jose Herrero  CORRECTED
April 14, 2023

1  director because she relayed to you the message from Norma

2  and from Paul and because of the way she spoke to you when

3  she referred to you as being deaf?

4  A.   And I'm going to add because she's the HR

5  director, she should know that in the past other people

6  with problem being accommodated so and at that moment

7  how can I think I cannot be accommodated if I had a

8  problem a letter from my profession if I had a health

9  problem that could be accommodating in order to continue

10  performing my job description to keep my job and she

11  chose to handle it in a different way.  As a HR director

12  she should know that in the past other employee within

13  my same department should be accommodated.  Why not me,

14  you know.

15  Q.   Okay.  So you're saying that other employees

16  within your same department who had other impairments were

17  accommodated?

18  A.   Yes.

19  Q.   Okay.  All right.  Now, Paul Mungo, what actions

20  by him do you claim constituted the disability

21  discrimination?

22  A.   I don't claim any action from him or Norma

23  alone.  I claim what I claim it's a like a joint

24  hierarchy, you know.  Like Norma is a director of

25  surgical service and he as a CNO.  Those two were

Jose Herrero   CORRECTED
April 14, 2023

1   mentioned in the conversation from Diana Montenegro when

2   she called me to tell me that what I spoke to you

3   before.

4        Q.    I understand.

5        A.    I'm not claiming individually one or the other

6   one because that never happened.  They never called me,

7   not even Norma, not even Paul.  It was mentioned in the

8   mail, in reading that, according to starting with the

9   verbal conversation that she mentioned.

10       Q.    Okay.  So what hierarchy or joint group of Norma

11  and Paul, according to you, do that was discriminatory?

12       A.    Repeat the question, please.

13       Q.    Sure.  What did Paul and Norma do that you're

14  saying is disability discrimination?

15       A.    I think the same of Diana, what they did,

16  well, they did not evaluate my concern, my situation, my

17  hearing impairment and the suggestion to be accommodated

18  to avoid more damage in my hearing problem, you know.

19  They should evaluate in different way trying to

20  accommodate because they were options and they didn't

21  analyze and they didn't consider that.  They didn't

22  offer.  It was like something really nasty or erratical

23  from the first moment that call and the letter in

24  reading the e-mail from them, Diana mentioned those two

25  persons and it was like that.  They never did it.

Jose Herrero  CORRECTED
April 14, 2023

1          Q.   Okay.

2          A.   They could do it different.

3          Q.   So just so I can make sure that I understand

4     that we're on the same page.  So your testimony is that

5     Norma Sabates and Paul Mungo discriminated against you

6     because they did not sufficiently evaluate your concerns

7     and did not accommodate you within the department?

8          A.   Yes.

9          Q.   Okay.  Anything else?

10         A.   And don't forget to include Diana Montenegro.

11         Q.   Sure.  Sure.  We already moved on from Diana.

12         A.   No.  Yes.

13         Q.   Okay.

14         A.   To your question, yes.

15         Q.   Now, for your failure to accommodate claim, your

16    failure to -- remember how we discussed the complaint and

17    there's a failure to accommodate claim, is it your

18    testimony then the same for Diana Montenegro, Paul Mungo

19    and Norma Sabates, that the failure to accommodate came to

20    be from what you described as not sufficiently evaluating

21    your concerns and accommodating you within the department?

22         A.   Yes.

23         Q.   Okay.  Anything else?

24         A.   No.  First of all, maybe there is another part

25    that we touched that particular detail.  They not even

Jose Herrero  CORRECTED
April 14, 2023

1  evaluate me and send me to evaluate as part of the work

2  compensation, not even through the hospital to

3  corroborate what's said in the letter and to evaluate

4  that even one previous specialist made a summary about

5  the same.  And the second after the specialist give the

6  letter and continue with my problem attention you know.

7  So --

8      Q.   And just so you know, because we're not here in

9  the workers' compensation case, like I'm not asking

10  questions about anything that deals with the workers'

11  compensation.  Just for purposes of discrimination,

12  because of the alleged disability and discrimination

13  because of the alleged failure to accommodate.  That's the

14  only thing I'm focused on right now.  Other than what we

15  have already gone over, are you claiming any other action

16  by any of those three people that constituted

17  discrimination or failure to accommodate?

18      A.   No.

19      Q.   Now, you were not terminated from your job until

20  earlier this year, right?

21      A.   Last month.

22      Q.   Okay.  And do you know who made the decision to

23  terminate employment?

24      A.   Well, the letter came from -- I never see that

25  in my life as a work employee of the South Miami

Jose Herrero  CORRECTED
April 14, 2023

1    Hospital, the letter came from Baptist, but the main and

2    sign it is from the supervisor on health physician which

3    is not really in a strong position or command to make

4    that letter.  It came from Salvador Betancourt.

5    Actually maybe the supervisor.  I don't know him.  I saw

6    him in the past at Doctors Hospital.  He is now

7    supervisor of South Miami Surgical Assistant Department.

8    The letter came from that and if I have further

9    questions, don't hesitate to call Diana Montenegro.  But

10   the letter, it state that do it really like a fable, a

11   drama do it to --

12        Q.   I didn't ask what the letter said though.  My

13   question was do you know who made the decision to

14   terminate you and your answer is the letter was signed by

15   Salvador Betancourt?

16        A.   Yes.

17        Q.   Okay.  And you said that you had never seen that

18   before, meaning you had never seen a supervisor, a health

19   physician sign a termination letter, but this is the first

20   termination letter that you received, right?

21        A.   Yes.

22        Q.   Okay.  As part of your job description your role

23   was not to see other people's termination letters, right?

24        A.   Right.

25        Q.   Other than the fact that the letter is signed by

Jose Herrero  CORRECTED
April 14, 2023

1   Mr. Betancourt, do you have any reason to believe that

2   anybody else made the decision to terminate your

3   employment?

4       A.   I don't have any other -- could be any other

5   people involved.  I don't know.

6       Q.   Okay.  I'm asking what you know.  Now what is

7   the accomodation that you believe you should have been

8   given?

9       A.   The accomodation that I should be given was to

10  assign me to the OB department or to assign me to doing

11  history and physical examination or assign me in the OR

12  with the exception of the case or restriction to assign

13  me in case that using tool to cut bone but make noise.

14      Q.   Okay.  So the accomodation that you believe you

15  should have been granted is that you be assigned to OB

16  department, obstetrics, that you be assigned to history

17  and physical or that you be put in the OR, but not do any

18  surgeries that require cutting bone?

19      A.   Correct.

20      Q.   Now you mentioned earlier when you were talking

21  to Diana Montenegro she offered you some roles in the

22  dietary department and in transportation?

23      A.   Cleaning, dietary or transportation.

24      Q.   Cleaning, dietary, transportation?  And those

25  position would have allowed you to continue earning your

Jose Herrero  CORRECTED
April 14, 2023

1   same pay, correct?

2        A.   Yes.   That's what she said.

3        Q.   And did you refuse those assignments?

4        A.   I never refused.

5        Q.   Did Diana Montenegro tell you to report to work

6   with the transportation department on June 7th?

7        A.   She told me to report disconsider when I send

8   to read the e-mail asking for send me the job

9   description on any position, those three you offer me.

10  And I did it on time and I supposed to get an answer

11  because if she send me something like report but I send

12  it something from mine asking for that.  And I never

13  received the answer that get inconclude.  Not that I

14  never report because of what I explained.

15       Q.   Okay.  But you ultimately never reported to the

16  transportation department on June 7th, correct?

17       A.   I can't understand.  Repeat.

18       Q.   You never reported to the transportation

19  department on June 7th?

20       A.   No.  I never reported.

21       Q.   And you never did or assume any of the positions

22  that were offered, the one in dining, the one cleaning and

23  the one in transportation, you never took those positions?

24       A.   No.  As I mentioned, she never writing to me

25  what I requested and she never mentioned any other

Jose Herrero  CORRECTED
April 14, 2023

1  alternative, any accomodation possible, all those three

2  options.

3      Q.   Okay.  And now once you did not report or you

4  did not take on the role in transportation and dining or

5  cleaning, my understanding is you were placed on an

6  extended leave of absence, is that correct?

7      A.   That's not correct.

8      Q.   Okay.

9      A.   There was something like the employee make it.

10     Q.   The what?

11     A.   That's something that was made by the

12  employee, but it wasn't leave of absence in that moment.

13     Q.   I'm sorry, I didn't catch that.

14     A.   I wasn't leave of absence at that moment.

15  When the time passed, six months after June 2021, I saw

16  which is unbelievable procedure because the family

17  medical leave has certain procedures, certain time.

18     Q.   I'm not talking about FMLA.  Sorry if confused

19  you.  After you did not report to the dining, to the

20  cleaning and to the transportation department, you did not

21  -- you continued to be employed, but you were not actually

22  working, correct?

23     A.   Correct.

24     Q.   And you remained an employee of Baptist until

25  you received your termination letter last month?

Jose Herrero  CORRECTED
April 14, 2023

1      A.   Yes, curiously, yes.

2      Q.   And while you were not working but were still an

3   employee of Baptist -- oh, I'm sorry.  And when I use

4   Baptist I'm referring to South Miami for the record, when

5   you were not working, but you were still an employee of

6   South Miami Hospital, wasn't there a person Nicholas

7   Agresti who was -- yes, Nick Agresti I think was the name

8   to help you find other positions within the Baptist Health

9   organization?

10      A.   Yes.  But never happened.

11      Q.   And Nicholas Agresti at some point in June of

12   2021 he sent you some opportunities within the Baptist

13   Health organization that you could potentially apply to

14   determine whether you could be accommodated?

15      A.   No.  That's not accurate.  That's -- I start

16   with Nicholas in July and it's really ridiculous, really

17   impacting that he was mimic of trying to send me after

18   receive my resume and everything he needed trying to get

19   a matching position for me on the same job description

20   that I was denied to accommodate.  And I say, even not

21   the same position, even like part-time, like lower rate,

22   lower time in hours, so but that never happened.  So I

23   say at one point, well, Nicholas, you're trying to get a

24   position you get in contact with HR.  You trying to get

25   a position for me in another facility within the same

Jose Herrero  CORRECTED
April 14, 2023

```
 1   system for surgical assistant doing the same what I was

 2   doing at South Miami, so what's the point because you

 3   going to try to get me a part time doing the same

 4   exposure to the same and I can't understand that.

 5       Q.   You were not in Nicholas Agresti's presence when

 6   he was searching for those jobs, correct?

 7       A.   Repeat the question.

 8       Q.   You were not in Nicholas Agresti's presence

 9   meaning in front of him when he was searching for those

10   positions?

11       A.   No.  No.  It was over the phone always.

12       Q.   And you don't know what behind the scenes

13   conversation he was having with the different hospitals to

14   try to accommodate you?

15       A.   Well, in one of the several times he told me,

16   well, I have to wait for the response from human

17   resource.  Even I was applying for the supervisor as a

18   health physician, because in fact in the past before

19   pass away, the previous supervisor sometime when she was

20   out I was designated by him to assign the job whatever,

21   maybe because my skill and my experience.  I applied for

22   supervisor of physician.  It was a position posting

23   another like in Doral, West Kendall, whatever, as a

24   surgical assistant I never get a call, nothing on the

25   process.  But he tried several times to do that
```

Jose Herrero  CORRECTED
April 14, 2023

1  empirically and that never happened and I usually stop

2  after I mention one day, you're trying to give me offer

3  me part time doing the same job description that I was

4  denied to accommodate doing the same?  That make sense

5  to you?

6      Q.   So let me ask you because my question was a

7  little narrower.  My question was you do not know what

8  behind the scenes conversations Mr. Agresti was having

9  with other hospitals regarding efforts to accommodate you?

10 You were not present during those conversations?

11     A.   No.  I was not present.

12     Q.   And you do not know how much time Mr. Agresti

13 spent looking for jobs for you?

14     A.   No.  I had no idea.

15     Q.   And you do not know how many people he spoke

16 with to try to accommodate you?

17     A.   No.

18     Q.   Now you mentioned the supervisor position, have

19 you ever seen the job description for the supervisor

20 position?

21     A.   I believe I reviewed at that time no other --

22 not other circumstantial moment.

23     Q.   Okay.  And obviously, a supervisor position,

24 that would have been a promotion from the role that you

25 had?

Jose Herrero  CORRECTED
April 14, 2023

1      A.   Yes.

2      Q.   Sorry, I'm waiting just because she needs to

3    capture the actual answer.  And you do not know who got

4    that position, if anyone?

5      A.   No.

6      Q.   And as you sit here today, do you know one way

7    or another what is everything that is required of the role

8    of supervisor?

9      A.   No.  I really don't get updated if some

10   change, some requirements, some particular credentials

11   or demand needed for that position in today date.  At

12   that moment when I apply and I think I met the

13   requirement for that, that's why I applied and I

14   mentioned to Nicholas Agresti.

15     Q.   Okay.  Do you keep notes of your interactions

16   with Mr. Agresti?

17     A.   Yes.  I keep some of the e-mail interchange.

18     Q.   Other than e-mails do you keep any other notes?

19     A.   No.  Just the phone call and the e-mail.

20     Q.   Okay.  Do you keep notes of your interactions

21   with anyone else at Baptist?

22     A.   Keep note?

23     Q.   Keep notes, like do you take notes like how I

24   took notes today?  Did you take notes and keep them

25   somewhere?

Jose Herrero  CORRECTED
April 14, 2023

1    anybody when you see every day.

2        Q.   And ever since you asked him if he was going to

3    be a witness in the case, have you or not in the case but

4    if he was -- that you were going to list him as a witness

5    have you spoken with him?

6        A.   No.

7        Q.   Okay.  Jorge Garcia Rivas, have you spoken with

8    him since you told him he was going to be a witness?

9        A.   No.  The same as Amaro, just if they will need

10   any questions or something related, you can call him.

11       Q.   Okay.  Now, if you go to page 2 at the top you

12   see Maria Antonia Camacho, you mentioned earlier was the

13   interim supervisor, right?

14       A.   Uh-huh.  Yes.

15       Q.   And you say here she has knowledge about

16   accommodations to other areas besides orthopedic surgery

17   and/or areas requiring drilling and cutting.  Was she

18   herself accommodated?

19       A.   Was she?

20       Q.   Was she accommodated?  Is that what you're

21   saying there?

22       A.   Yes.

23       Q.   Okay.  So your testimony is that Maria Antonia

24   Camacho is somebody who had a disability or a disabling

25   condition at some point and she was accommodated?

Jose Herrero  CORRECTED
April 14, 2023

1      A.   Yes.

2      Q.   Okay.  Jose Tudela, T-U, D as in David E-L-A, it

3   says knowledge about accommodations to other areas besides

4   orthopedic surgery and/or areas requiring drilling and

5   cutting.  Is he somebody who you're also claiming had an

6   impairment and he was accommodated?

7      A.   Yes.

8      Q.   Manual Serrano, knowledge about accommodations

9   to other areas besides orthopedic surgery and/or areas

10  requiring drilling and cutting.  Is he somebody else that

11  you're claiming had an impairment and was accommodated?

12     A.   Well, he was accommodated, but on the top of

13  accomodation he was accommodated on the top of working

14  on the daily basis when he has some health issues like

15  hand or ankle he was accommodated to do H&P.  That's why

16  I put it right there.

17     Q.   So again, this is another person who you're

18  claiming had an impairment and was accommodated?

19     A.   Uh-huh.

20     Q.   Armando Sarasua, S-A-R-A-S-U-A, are you also

21  claiming that Armando Sarasua had an impairment and was

22  accommodated?

23     A.   No, in this case he wasn't related to any

24  impairment, because as a common denominator in the other

25  one he was implicit favoritism, nepotism, whatever --


Baptist Health
South Florida

## Employee Job Description

**Job Title:** Surgical House Physician        **Job Code:** 10689

**Last Update:** 07/06/2017

| | |
|---|---|
| **Required Qualifications:**<br><br>**Also Refer to Below Section** | MD Doctor of Medicine / DO<br>BLS Basic Life Support<br>HSE House Physician<br>ME Medical Doctor |
| **Additional Information Regarding Qualifications:** | State of Florida House Physician License. |
| **Minimum Required Experience:** | 2 Years |
| **Job Summary/Purpose:** | A House Physician is a person who holds a degree as a medical doctor, or its equivalent, but does not have and has never had a license to practice medicine in Florida, and is employed and paid by a hospital. (Florida Statute: 6488-6.006) |
| **Essential Job Functions:** | Serves as a first assistant to the attending surgeon. Procedural competencies and what may be delegated is limited to those documented in this job description. The critical portion of a surgical procedure may not be delegated to the surgical house physician.<br><br>Demonstrates knowledge of surgical skill and tissue handling as its pertains to the assigned surgical procedure.<br><br>Applies electrocautery tip to clamps or tissue in a safe and knowledgeable manner as directed by the surgeon. Sponges and utilizes pressure, as needed. Utilizes suction techniques.<br><br>Performs and records History and Physical examinations on patients.<br><br>Provides hemostasis by clamping blood vessels, coagulation, ligating vessels and by other means as directed by the surgeon.<br><br>Performs skin and subcutaneous wound closure as directed by the surgeon and under the direct supervision of the surgeon within the OR suite.<br><br>Performs positioning, prepping and draping of the patient.<br><br>Applies clamps on vessels and the tying and electro-coagulation of them as directed by the surgeon. Provides exposure through appropriate use of instruments, retractors, suctioning and sponging techniques.<br><br>May assist with non-core privileges that require additional training and |


EXHIBIT
JH 8
4-14-23

South Miami Hospital/Herrero - Position Statement
0013

Baptist Health
South Florida

| | certification per facility guidelines -Application of cast, splints and various other immobilization devices, Preparation of grafts as directed by surgeon during operative procedures, Harvest the saphenous vein for coronary grafting under direct guidance by surgeon, Laparoscopic procedures - Bedside robotic procedures<br><br>Applies surgical dressings.  Assists the surgeon at the completion of the procedure by affixing and stabilizing all drains, cleaning the wound and applying the dressings.<br><br>Other duties as assigned. |
|---|---|
| **Marginal Job Functions:** | Anticipates and responds appropriately to the surgical team during an operative procedure.<br><br>Assist with the patient in crisis (i.e. respiratory, cardiac) and assists the surgeon and anesthesia team.<br><br>Assesses and manages the intraoperative patient based upon age, history type of surgical procedure and type of anesthesia.<br><br>Follows proper safety procedures, OSHA guidelines and lift techniques. Reports all injuries and unsafe practices to Director of Surgical Services.<br><br>Communicates effectively with hospital employees, physicians and patients.<br><br>Upon completion of an H&P, can provide specific patient/family/significant other education based  upon the patient's assessed learning needs, barriers, type of surgical procedure, anticipates preparation and recovery issues, age specific differences and cultural needs.<br><br>Effectively communicates with the patient experiencing altered level of consciousness and anxiety.<br><br>Utilizes appropriate age-specific communication skills.<br><br>Demonstrates knowledge of surgical skills and tissue handling  as directed by surgeon, during operative procedure.<br><br>Properly handles surgical instrumentation.<br><br>Orients and reassures the patient during the surgical experience.<br><br>Acts as a preceptor for new House Physicians in the department. |


Baptist Health
South Florida

## ADA Criteria

## Multiple Requirements:

| Physical Requirement | Description | Frequency<br>Occasionally = 1-33%<br>Frequently = 34-66%<br>Constantly = 67-99%<br>of time | Hours/ Duration at a Time | Distance | Weight |
|---|---|---|---|---|---|
| Carrying | Transporting an object usually holding it in the hands or arms, or on the shoulder. | Frequently | N/A | > 30' use cart | > 30 lbs. (cart required) |
| Lifting | Raising or lowering an object from one level to another. | Frequently | N/A | N/A | Up to 35 lbs. |
| Pushing/Pulling | May include office drawers, carts, beds and stretchers. | Frequently | N/A | > 200' | Up to 50 lbs. |
| Sitting | Remaining in a seated position. | Occasionally | 0-2 hours | N/A | N/A |
| Standing | Remaining on one's feet in an upright position at a work station without moving about. | Constantly | 6-8 hours | N/A | N/A |
| Walking | To move about on foot or traverse work area. | Constantly | 6-8 hours | N/A | N/A |



## Physical Requirements:

| Physical Requirement | Description | Frequency<br>Occasionally = 1-33%<br>Frequently = 34-66%<br>Constantly = 67-99%<br>of time |
|---|---|---|
| Hand/Finger: Fine Manipulation | To manipulate small objects rapidly and/or accurately. | Constantly |
| Hand Grasping | To seize and hold one or more objects in one's hand(s). To work with the hand(s) in placing / turning motions. | Constantly |
| Driving | Operate a motorized vehicle. | N/A |
| Climb & Descend Ladder | To go up or ascend a ladder, by using the hands and feet or feet only. To go down or descend a ladder, by using the hands and feet or feet only. | N/A |
| Bending / Stooping | To bend the head and shoulders, or the body, forward and downward from an erect position. May also include side or backward bending of the spine. | Occasionally |
| Crawling | Move freely on hands and knees. | Occasionally |
| Kneeling | To bear weight on one or both knees. | Occasionally |
| Reaching Overhead | To touch or grasp by extending a part of the body (such as a hand). | Occasionally |
| Squatting | To sit in a low or crouching position with the legs drawn up closely beneath or in front of the body; sit on one's haunches or heels. | Occasionally |
| Use Stairs | To go up or ascend stairs, by using the hands and feet or feet only. To go down or descend stairs, by using the hands and feet only. | Occasionally |
| Color Vision | Ability to perceive or comprehend colors through the sense of sight, and distinguish between colors. | Required |
| Communication | Ability to understand meanings of words and to use words effectively in order to clearly present information or ideas. | Required |
| Hearing | Ability to distinguish between different tones in person and through electronic devices, and understand meanings of words associated with them. To comprehend language. | Required |
| Speaking / Talking | Ability to express or communicate by voice, words and ideas to others. | Required |
| Vision | Ability to perceive or comprehend through the sense of sight, including the ability to read words and recognize symbols. | Required |


**Baptist Health
South Florida**

## Environmental Requirements:

| Job requires exposure to the following: | Frequency<br>Occasionally = 1-33%<br>Frequently = 34-66%<br>Constantly = 67-99%<br>of time |
|---|---|
| Blood and/or bodily fluids | Constantly |
| Hazardous waste | Constantly |
| Latex | Constantly |
| Risk of radiation exposure | Frequently |
| Extreme cold (non-weather) | N/A |
| Grease or oil | N/A |
| Extreme heat (non-weather) | N/A |
| Work in high, precarious places | N/A |
| Work near moving mechanical parts | N/A |
| Outdoor weather conditions | N/A |
| Wet or humid conditions (non-weather) | N/A |
| Fumes or airborne particles | Occasionally |
| Toxic or caustic chemicals | Occasionally |
| Risk of electrical shock | Occasionally |
| Extreme noise (interferes with normal conversation) | Occasionally |
| Vibration | Occasionally |

## Age-Specific Criteria

| Neonate | Infant | Child | Adult | Geriatric |
|---|---|---|---|---|
| X | X | X | X | X |

**Signature :** _____   **Date :** _____